# In the United States Court of Federal Claims

### No. 10-303C
### Filed June 30, 2015

| | | |
|---|---|---|
| * * * * * * * * * * * * * * | * | |
| **JOHN THOMAS,** | * | |
| | * | **Summary Judgment; Army Corps of** |
| **Plaintiff,** | * | **Engineers; Civilian Pay; Living** |
| **v.** | * | **Quarters Allowance; Overseas** |
| | * | **Differentials and Allowances Act, 5** |
| **UNITED STATES,** | * | **U.S.C. § 5921 et seq.** |
| | * | |
| **Defendant.** | * | |
| | * | |
| * * * * * * * * * * * * * * | * | |

**Lisa A. Kleine**, Shaw, Bransford & Roth, P.C., Washington, D.C., for plaintiff. With her was **Debra L. Roth**, Shaw, Bransford & Roth, P.C., Washington, D.C.

**Jane C. Dempsey**, Trial Attorney, United States Department of Justice, Washington, D.C., for defendant. With her was **Benjiman C. Mizer**, Principal Deputy Assistant Attorney General, **Robert E. Kirschman, Jr.**, Director, **Steven J. Gillingham**, Assistant Director, Department of Justice.

## O P I N I O N

**HORN, J.**

### FINDINGS OF FACT

Plaintiff John Thomas, a civilian Army Corps of Engineers (Army Corps) employee, alleges he has been wrongfully denied a Living Quarters Allowance (LQA) since June 2004, when he began working for the Army Corps, or, alternatively, from March 2009, when the Commander of Mr. Thomas' Army Corps District requested he receive LQA, or, as a further alternative, from October 2009, when the Commander requested any requirements of the LQA regulation Mr. Thomas did not meet be waived. Plaintiff estimates his lost compensation as a result of the denial of LQA to be approximately $400,000.00.

Mr. Thomas currently lives and works in Aviano, Italy, where he has served as a construction representative for the Army Corps since June 1, 2004. Prior to his employment with the Army Corps, and within one year of his retirement from the United States Air Force, Mr. Thomas was employed beginning in October 2003 as a civilian

United States government contractor with Wireless Communication Technical Services, Inc. (Wireless), a United States firm, and was living and working in Italy under a United States Forces sponsored visa. Mr. Thomas was recruited by Wireless in the United States at his legal residence in Texas. He was hired with the understanding that he would return to Texas when his contract ended. Mr. Thomas' offer of employment with Wireless provided that he would be reimbursed for the cost of return transportation to the United States if he resigned or if employment was no longer available, "[u]pon completion of 12 months of employment."

On April 17, 2004, Mr. Thomas applied for a position with the Army Corps under Vacancy Announcement NEGE04786352. The vacancy announcement requested applicants for a permanent, full-time, construction representative position in Aviano, Italy. The announcement limited the selection pool to United States Army employees or to United States citizens residing in the commuting area who were eligible for a family member appointment. The vacancy announcement stated that permanent change of station expenses were not authorized, but was silent as to whether LQA was authorized. Mr. Thomas was initially notified that he did not meet the eligibility criteria for the position and that he was not on the referral list. Subsequently, the Army Corps offered to appoint Mr. Thomas, who had previously, honorably retired from the United States Air Force, to the construction representative position, using the Veterans Recruitment Appointment authority. On May 14, 2004, Mr. Thomas received and accepted the Army Corps' offer of employment via email. On May 17, 2004, he sent his letter of resignation to Wireless, and, on May 28, 2004, he resigned from Wireless.

Even prior to the Army Corps' formal job offer, there apparently was discussion regarding whether Mr. Thomas could receive a LQA. On May 12, 2004, Mr. Lawrence Riles, an Army Corps resident engineer, sent an email to Lt. Col. Joseph Gandara regarding Mr. Thomas stating, "I need to see if we can get him LQA; supposedly, he qualifies since he falls under the regulation requirements: GS-9 or higher, hard to fill position, and separated from service less than one year." On May 14, 2004, Mr. Riles sent Mr. Thomas an email stating, "As soon as you are officially chosen, then we need to get started on trying to get the LQA."

On May 20, 2004, a human resources assistant for the Army Corps sent an email to Mr. Thomas requesting that he complete certain forms to finish the hiring action. When Mr. Thomas responded the same day with an email inquiring about the steps needed to apply for LQA, the assistant replied "No LQA nor PCS [Permanent Change of Station expenses] authorized." Mr. Riles, who was copied on this email, then sent Mr. Thomas an email advising him not to "bring this [LQA issue] up right now" because it "may complicate the hiring action." Mr. Riles continued: "Next week we will find the form and submit the application based upon the regulations . . . . this is not their call if you fall under the regs . . . ." (ellipses in original). Both the Army Corps' Request for Personnel Action (Standard Form 52) and the Notification of Personnel Action (Standard Form 50) related to Mr. Thomas' hiring state that he was a "Local hire - not entitled to LQA or transportation agreement." Similarly, the Army Corps' Checklist for Recruit Actions completed for Mr. Thomas states the he was "Locally recruited in Italy" and that a "Completed LQA Eligibility Form" was "NA [not applicable]."

On June 21, 2004, Mr. Thomas submitted a request for LQA to Ms. Karen Lenhardt of the Army Corps' Employee Support Office, arguing that he was eligible under Army in Europe Regulation (AER) 690-500.592, issued June 20, 2003. Mr. Thomas never received a written response to this request, but, in his November 14, 2005 LQA request to the Army Corps' Employee Support Office discussed below, he indicated that Ms. Lenhardt did verbally inform him that he would not be paid LQA because he was a local hire and that AER 690-500.592 was inapplicable because he "work[ed] for the Corps, not the US Army."

The November 14, 2005 request Mr. Thomas submitted to the Army Corps' Employee Support Office asked that his LQA request be "properly reviewed." Lt. Col. Angela Lungu, Deputy Commander of the Army Corps, Europe District, responded to him with a memorandum indicating that the original decision not to offer him LQA would not be reversed for two reasons: "First, as you were already living in the overseas area, and, second, this allowance was not being offered to other applicants who may have applied through the competitive process for the same position." Lt. Col. Lungu also indicated that Mr. Thomas had failed to provide "any mitigating circumstances that would warrant a reversal of the original decision," and that "[a]lso taken into consideration is the fact that you were informed, prior to reporting for duty, that LQA would not be authorized, and you still willingly accepted without LQA being authorized."

On February 21, 2006, Mr. Thomas submitted a formal grievance to Col. Margaret Burcham, Commander of the Army Corps, Europe District, regarding his request for LQA, arguing that he was eligible under AER 690-500.592. On March 9, 2006, Col. Burcham, responded with a memorandum denying Mr. Thomas' grievance on the grounds that the non-receipt of LQA was not grievable under the Administrative Grievance System. Col. Burcham also noted two additional pieces of information: (1) "it was never the intent to offer LQA for the position to which you were hired" and (2) AER 690-500.592 did not apply to Mr. Thomas' case because "[w]hile the Army Corps of Engineers are Army employees in Europe, we follow a different chain of command, report to a different major command (MACOM), and observe our own LQA policies."

On March 4, 2007, Mr. Thomas filed a claim for LQA with the United States Office of Personnel Management (OPM). On April 18, 2008, OPM issued a decision sustaining the Army Corps' denial of LQA, finding that Mr. Thomas had failed to present clear and convincing evidence that AER 690-500.592 should have been applied to his case, that, absent such evidence, OPM must accept the Army Corps' position that it set its own LQA policy, and that the evidence supported the Army Corps' position that it did not intend to authorize LQA for Mr. Thomas' position.

On September 15, 2008, Mr. Thomas sent a memorandum to Col. John Kem, who had replaced Col. Burcham as Commander of the Army Corps, Europe District, asking that his request for LQA be re-evaluated. On March 16, 2009, Col. Kem sent a memorandum to the Army's Civilian Personnel Directorate (CPD) requesting that it approve LQA for Mr. Thomas on the grounds that Mr. Thomas satisfied the requirements of Department of State Standardized Regulation (DSSR) § 031.12b and AER 690-500.592, that it would be more costly to lose him and have to recruit another

employee, and that his housing costs were minimal. This request was denied. Explaining the reason for this denial, Ms. Brigitte Brown, Chief of the Overseas Services Division of the Civilian Human Resources Agency, Northeast/Europe Region, stated that the Living Quarters Allowance Policy, dated July 20, 2001, issued by the Army Corps, Europe District (the 2001 LQA Policy), was the applicable LQA policy in effect at the time Mr. Thomas was hired and that Mr. Thomas failed to meet the requirements of this policy because he was a locally hired individual and his Commander had not approved LQA prior to his selection. Ms. Brown also stated that she had reviewed paragraph 7a(3) of AER 690-500.592 (November 18, 2005), which, she stated, became applicable to Mr. Thomas when the Civilian Human Resources Agency began servicing the Army Corps after he was hired, and that Mr. Thomas did not meet its requirements. Therefore, according to Ms. Brown, her office could not authorize LQA for Mr. Thomas.

In November 2009, Col. Kem sent a second memorandum to the Army's CPD requesting that it waive the requirements of any portion of AER 690-500.592 that it determined Mr. Thomas did not meet. This request was denied in a March 2, 2010 memorandum by Aleck Hernandez, Chief of the Employment Compensation Branch of the CPD. In his memorandum, Mr. Hernandez explained that, when Mr. Thomas was hired, the Army Corps itself administered its civilian personnel administration, and, at that time, the Army Corps had issued the 2001 LQA Policy, exercising its authority to supplement existing DSSR and Department of Defense guidance for overseas benefits and allowances. Mr. Hernandez stated that, at the time Mr. Thomas was hired, he was determined to be ineligible for LQA under the Army Corps' 2001 LQA Policy because he was a locally hired employee, he was not authorized for LQA, and there was no indication of any expressed determination by the commanding officer to authorize LQA for him. Mr. Hernandez further stated that, in April 2008, the servicing of civilian Army Corps employees, including the administration of LQA, was assumed by the Army's Civilian Human Resources Agency, Europe Region (CHRA-E) and that, from that time forward, eligibility for LQA was determined by AER 690-500.592, rather than the Army Corps' 2001 LQA Policy. Mr. Hernandez found that Mr. Thomas did not qualify for LQA under paragraph 7a(3) of AER 690-500.592 because the assumption of services by CHRA-E did not constitute a "transfer" of the employee involved. In addition, Mr. Hernandez stated that although the continuing eligibility for LQA provision of AER 690-500.592, paragraph 9, did not "fully meet Mr. Thomas's situation," it provided the "underlying rationale" for the Army Corps' inability to grant him a waiver. In particular, Mr. Hernandez pointed to language in paragraph 9 stating that it "[w]ill not extend or reinstate payment of LQA when law, regulation, or policy directed termination of payment" (alteration in original).[1] Therefore, according to Mr. Hernandez, the Army Corps was unable to grant Mr. Thomas LQA under AER 690-500.592 "since said regulation specifically prohibits to establish an eligibility for the allowance when it was previously not authorized by that employee's agency."

Mr. Thomas filed his original complaint in this court on May 19, 2010. Initially, the case was assigned to, and heard by, Judge Lawrence Baskir, who held that the United

---

[1] In his memorandum, Mr. Hernandez mistakenly says that this language is in AER 690-500.592, paragraph 10.

States Court of Federal Claims had jurisdiction to review Mr. Thomas' case because the combination of the statute authorizing LQA grants, the Overseas Differentials and Allowances Act, 5 U.S.C. § 5921 et seq., and its implementing regulation, DSSR § 031.12, provided money-mandating authority. See Thomas v. United States, No. 10-303C, 2011 WL 9976337, at *4 (Fed. Cl. Sept. 7, 2011). Judge Baskir awarded summary judgment to Mr. Thomas on the issue of liability. See id. Following discussions between the parties regarding damages, a Motion for Reconsideration was filed by the government on February 6, 2012. Before a decision on the Motion for Reconsideration was issued, on October 11, 2012, the above-captioned case was reassigned to Judge George Miller, who denied the reconsideration motion on February 8, 2013, determining, "[s]ince defendant relies only on its previous arguments and cites no contrary controlling law, the Court declines to grant defendant's motion for reconsideration." Thomas v. United States, No. 10-303C, 2013 WL 514522, at *2 (Fed. Cl. Feb. 8, 2013). After further discussions between the parties and the filing of a stipulation regarding damages, Judge Miller entered judgment in favor of the Mr. Thomas on June 4, 2013.

The government timely filed a notice of appeal on August 2, 2013. On April 16, 2014, the United States Court of Appeals for the Federal Circuit vacated the judgment of the United States Court of Federal Claims and remanded the case back to the trial court "to examine its [the Court of Federal Claims'] decision in light of Roberts[ v. United States, 745 F.3d 1158 (Fed. Cir. 2014)]," which had been issued prior to the decision in the Thomas appeal, but after Judge Miller's decision.

Once remanded, the case, again, was reassigned, this time to the undersigned judge for further proceedings. An amended complaint was filed on January 7, 2015, and the issues were fully briefed on renewed Motions for Judgment on the Administrative Record, or, in the alternative, Motions for Summary Judgment. Oral argument was held on June 17, 2015, at which Mr. Thomas' current attorney of record appeared for the first time.

## DISCUSSION

### I.      Jurisdiction

In general, the Tucker Act grants jurisdiction to this court as follows:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (2012). As interpreted by the United States Supreme Court, the Tucker Act waives sovereign immunity to allow jurisdiction over claims against the United States (1) founded on an express or implied contract with the United States, (2) seeking a refund from a prior payment made to the government, or (3) based on federal constitutional, statutory, or regulatory law mandating compensation by the federal

government for damages sustained. See United States v. Navajo Nation, 556 U.S. 287, 290 (2009); United States v. Testan, 424 U.S. 392, 400 (1976); see also Chattler v. United States, 632 F.3d 1324, 1130 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2011); Greenlee Cnty., Ariz. v. United States, 487 F.3d 871, 875 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 552 U.S. 1142 (2008); Palmer v. United States, 168 F.3d 1310, 1314 (Fed. Cir. 1999).

"Not every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act. The claim must be one for money damages against the United States . . . ." United States v. Mitchell, 463 U.S. 206, 216 (1983); see also United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2003); RadioShack Corp. v. United States, 566 F.3d 1358, 1360 (Fed. Cir. 2009); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1343 (Fed. Cir. 2008) ("[P]laintiff must . . . identify a substantive source of law that creates the right to recovery of money damages against the United States."). In Ontario Power Generation, Inc. v. United States, 369 F.3d 1298 (Fed. Cir. 2004), the United States Court of Appeals for the Federal Circuit identified three types of monetary claims for which jurisdiction is lodged in the United States Court of Federal Claims. The court wrote:

> The underlying monetary claims are of three types. . . . First, claims alleging the existence of a contract between the plaintiff and the government fall within the Tucker Act's waiver. . . . Second, the Tucker Act's waiver encompasses claims where "the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum." Eastport S.S. [Corp. v. United States, 178 Ct. Cl. 599,] 372 F.2d [1002,] 1007-08 [(1967)] (describing illegal exaction claims as claims "in which 'the Government has the citizen's money in its pocket'" (quoting Clapp v. United States, 127 Ct. Cl. 505, 117 F. Supp. 576, 580 (1954))) . . . . Third, the Court of Federal Claims has jurisdiction over those claims where "money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury." Eastport S.S. [Corp. v. United States], 372 F.2d at 1007. Claims in this third category, where no payment has been made to the government, either directly or in effect, require that the "particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." Id.; see also [United States v.] Testan, 424 U.S. at 401-02 ("Where the United States is the defendant and the plaintiff is not suing for money improperly exacted or retained, the basis of the federal claim-whether it be the Constitution, a statute, or a regulation-does not create a cause of action for money damages unless, as the Court of Claims has stated, that basis 'in itself . . . can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" (quoting Eastport S.S. [Corp. v. United States], 372 F.2d at 1009)). This category is commonly referred to as claims brought under a "money-mandating" statute.

Ontario Power Generation, Inc. v. United States, 369 F.3d at 1301.

6

To prove that a statute or regulation is money-mandating, a plaintiff must demonstrate that an independent source of substantive law relied upon "'can fairly be interpreted as mandating compensation by the Federal Government.'" United States v. Navajo Nation, 556 U.S. at 290 (quoting United States v. Testan, 424 U.S. at 400); see also United States v. White Mountain Apache Tribe, 537 U.S. at 472; United States v. Mitchell, 463 U.S. at 217; Roberts v. United States, 745 F.3d at 1162; Blueport Co., LLC v. United States, 533 F.3d 1374, 1383 (Fed. Cir. 2008), cert. denied, 555 U.S. 1153 (2009). The source of law granting monetary relief must be distinct from the Tucker Act itself. See United States v. Navajo Nation, 556 U.S. at 290 (The Tucker Act does not create "substantive rights; [it is simply a] jurisdictional provision[] that operate[s] to waive sovereign immunity for claims premised on other sources of law (e.g., statutes or contracts)."). "'If the statute is not money-mandating, the Court of Federal Claims lacks jurisdiction, and the dismissal should be for lack of subject matter jurisdiction.'" Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1308 (Fed. Cir. 2008) (quoting Greenlee Cnty., Ariz. v. United States, 487 F.3d at 876); Fisher v. United States, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (The absence of a money-mandating source is "fatal to the court's jurisdiction under the Tucker Act."); Peoples v. United States, 87 Fed. Cl. 553, 565-66 (2009). "Further, the statute and regulations must be money-mandating as to the class of which plaintiff claims to be a member." Roberts v. United States, 745 F.3d at 1162 (citing Casa de Cambio Comdiv S.A. de C.V. v. United States, 291 F.3d 1356, 1361 (Fed. Cir. 2002)).

When the United States Court of Appeals for the Federal Circuit remanded the above-captioned case to this court, the instruction was "to examine its [the Court of Federal Claims'] decision in light of Roberts." The two previous trial court judges who had been assigned the case both had found that jurisdiction in this court for Mr. Thomas' case was proper, but both decisions were issued before the Federal Circuit issued Roberts v. United States, 745 F. 3d 1158. In Roberts, the Federal Circuit determined that the Overseas Differentials and Allowances Act and the DSSR, standing alone, "are only money-authorizing and are not money-mandating." Id. at 1165. When, however, additional regulations implementing the DSSR "provide that a particular class is entitled to LQA and the plaintiff alleges that he is within that class, the regulations are money-mandating and the court has jurisdiction." Id. at 1167. The implementing regulation at issue in Roberts v. United States was an Order issued by the Commander of the Marine Corp Bases Japan (MCBJ), pursuant to a Secretary of the Navy Instruction delegating to the Commandant of the Marine Corps, among others, the power to award LQA, a power that was delegated to the Secretary of the Navy by the Secretary of Defense in Department of Defense Instruction 1400.25, subchapter 1250, itself an implementing regulation of the DSSR. See id. at 1166. The MCBJ Order limited the granting of LQA to two situations: (1) for new hires, when the appointing officer had designated a position as LQA-eligible based on recruitment need and expense; and (2) "[a]pplicants currently receiving LQA from another DoD component on island may be granted continuance of LQA at management's discretion." Id. (alteration in original). The Federal Circuit determined that the MCBJ Order, when combined with the Overseas Differentials and Allowances Act and the DSSR, was money-mandating "because the payment of money is required when the MCBJ Commander, acting pursuant to the Order, determines that a particular post is LQA-eligible or an individual should receive an LQA-continuance (i.e.,

LQA 'shall be paid,' 5 U.S.C. § 5922(c), in these instances)." Id. (emphasis in original). Because the plaintiff in Roberts alleged he was a member of one of these classes, jurisdiction in the Court of Federal Claims existed. See id. at 1167.

In his complaint in this court, Mr. Thomas alleges that he met the requirements of the 2001 LQA Policy at the time of his hire. Like the MCBJ Order in Roberts, the 2001 LQA Policy was issued pursuant to Department of Defense Instruction 1400.25, subchapter 1250, and, thus, was published to implement the DSSR.[2] The LQA-authorizing provision of the 2001 LQA Policy states that "LQA will be authorized" for employees who meet the criteria it lists. Such language is mandatory and requires the payment of LQA to these employees. See Britell v. United States, 372 F.3d 1370, 1378 (Fed. Cir. 2004) ("This and other courts have repeatedly held that this type of mandatory language, e.g., 'will pay' or 'shall pay,' creates the necessary 'money-mandate' for Tucker Act purposes."). Indeed, the language in the 2001 LQA Policy is actually stronger than the language in the Roberts MCBJ Order, which stated that an LQA continuance "may be granted . . . at management's discretion." Roberts v. United States, 745 F.3d at 1166 (emphasis added). Under Roberts, the Army Corps' 2001 LQA Policy, therefore, is money-mandating when combined with the Overseas Differentials and Allowances Act and the DSSR. See id. Because Mr. Thomas argues that he met the requirements of the 2001 LQA Policy at the time he was hired, jurisdiction exists for this court to hear his case. As noted in Roberts, "once the regulations provide that a particular class is entitled to LQA and the plaintiff alleges that he is within that class, the regulations are money-mandating and the court has jurisdiction." Id. at 1167 (citing Doe v. United States, 463 F.3d 1314, 1325 (Fed. Cir. 2006)).

---

[2] In Roberts, the Federal Circuit treated both Department of Defense Instruction 1400.25, subchapter 1250, and the MCBJ Order as "regulations," see Roberts v. United States, 745 F.3d at 1165-66, even though there was no indication that either document was promulgated through notice-and-comment rule making. See 5 U.S.C. § 553 (2012) (detailing the procedure to be used for agency rule making). Thus, it appears that the Federal Circuit intended to take a broad, functional, view of published or generally available guidance as sufficient implementing language to direct a money-mandating circumstance establishing jurisdiction in this court. The 2001 LQA Policy, like the MCBJ Order in Roberts, was not a classic regulation, but was issued to implement LQA policy by a military commander and detailed specific criteria for the awarding of LQA to all individuals serving in the command.

## II.     The Cross-Motions for Summary Judgment[3]

Having determined that this court has jurisdiction of Mr. Thomas' case, the court turns to disposition of the motions filed by the parties. As indicated in Roberts, "[t]he question of whether [plaintiff] in fact is within a class and entitled to LQA is a merits issue." Id. Rule 56 of the Rules of the United States Court of Federal Claims (RCFC) (2014) is similar to Rule 56 of the Federal Rules of Civil Procedure in language and effect. Both rules provide that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a); Fed. R. Civ. P. 56(a) (2014); see also Alabama v. North Carolina, 560 U.S. 330, 344 (2010); Hunt v. Cromartie, 526 U.S. 541, 549 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970); Biery v. United States, 753 F.3d 1279, 1286 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); Ladd v. United States, 713 F.3d 648, 651 (Fed. Cir. 2013); Minkin v. Gibbons, P.C., 680 F.3d 1341, 1349 (Fed. Cir. 2012); Noah Sys., Inc. v. Intuit Inc., 675 F.3d 1302, 1309-10 (Fed. Cir. 2012); Advanced Fiber Techs. (AFT) Trust v. J & L Fiber Servs., Inc., 674 F.3d 1365, 1372 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2012); Fujitsu Ltd. v. Netgear Inc., 620 F.3d 1321, 1325 (Fed. Cir.), reh'g denied (Fed. Cir. 2010); Consol. Coal Co. v. United States, 615 F.3d 1378, 1380 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2010), cert. denied, 131 S. Ct. 2990 (2011); 1st Home Liquidating Trust v. United States, 581 F.3d 1350, 1355 (Fed. Cir. 2009); Arko Exec. Servs., Inc. v. United States, 553 F.3d 1375, 1378 (Fed. Cir. 2009); Casitas Mun. Water Dist. v. United States, 543 F.3d 1276, 1283 (Fed. Cir. 2008), reh'g and reh'g en banc denied, 556 F.3d 1329 (Fed. Cir. 2009); Moden v. United States, 404 F.3d 1335, 1342 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2005); Am. Pelagic Fishing Co., L.P. v. United States, 379 F.3d 1363, 1370-71 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005); Mata v. United States, 114 Fed. Cl. 736, 744 (2014); Leggitte v. United States, 104 Fed. Cl. 315, 317 (2012);

---

[3] In their briefings to this court after the remand, both parties argued, in the alternative, that there were no genuine issues of material fact, and, that, therefore, they were entitled to Summary Judgment for the same reasons they were entitled to Judgment on the Administrative Record. The Administrative Record, after remand, was not certified. See RCFC 52.1(a) (2014). Therefore, out of an abundance of caution, the court is deciding the parties' motions as Motions for Summary Judgment under RCFC 56, rather than as Cross-Motions for Judgment on the Administrative Record under RCFC 52.1. In doing so, the court notes that Mr. Thomas' previous attorney, Ms. Roth, did not immediately object that the Administrative Record was not certified. In its initial scheduling Order after the above-captioned case was remanded by the Federal Circuit, this court ordered the government to file an Administrative Record by August 29, 2014 "after consultation and review by plaintiff," and the Administrative Record was filed on that date. Mr. Thomas' attorney raised her objection about the Administrative Record's lack of certification for the first time in Plaintiff's Motion for Judgment on the Administrative Record, which was filed on November 14, 2014, two and half months after the Administrative Record was filed, and four weeks after the government filed its Cross-Motion for Judgment on the Administrative Record.

Arranaga v. United States, 103 Fed. Cl. 465, 467-68 (2012); Cohen v. United States, 100 Fed. Cl. 461, 469 (2011); Boensel v. United States, 99 Fed. Cl. 607, 610 (2011).

A fact is material if it will make a difference in the result of a case under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; see also Marriott Int'l Resorts, L.P. v. United States, 586 F.3d 962, 968 (Fed. Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248); Mata v. United States, 114 Fed. Cl. at 744; Arranaga v. United States, 103 Fed. Cl. at 467-68; Thompson v. United States, 101 Fed. Cl. 416, 426 (2011); Cohen v. United States, 100 Fed. Cl. at 469. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48; see also Scott v. Harris, 550 U.S. 372, 380 (2007); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d 1253, 1257 (Fed. Cir. 2001); Gorski v. United States, 104 Fed. Cl. 605, 609 (2012); Walker v. United States, 79 Fed. Cl. 685, 692 (2008); Curtis v. United States, 144 Ct. Cl. 194, 199, 168 F. Supp. 213, 216 (1958), cert. denied, 361 U.S. 843 (1959), reh'g denied, 361 U.S. 941 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249; see, e.g., Schlup v. Delo, 513 U.S. 298, 332 (1995); Ford Motor Co. v. United States, 157 F.3d 849, 854 (Fed. Cir. 1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); TigerSwan, Inc. v. United States, 118 Fed. Cl. 447, 451 (2014); Dana R. Hodges Trust v. United States, 111 Fed. Cl. 452, 455 (2013); Cohen v. United States, 100 Fed. Cl. at 469-70; Boensel v. United States, 99 Fed. Cl. at 611; Macy Elevator, Inc. v. United States, 97 Fed. Cl. 708, 717 (2011); Dick Pacific/GHEMM, JV ex rel. W.A. Botting Co. v. United States, 87 Fed. Cl. 113, 126 (2009); Johnson v. United States, 49 Fed. Cl. 648, 651 (2001), aff'd, 52 F. App'x 507 (Fed. Cir. 2002), published at 317 F.3d 1331 (Fed. Cir. 2003). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 250-52; Jay v. Sec'y of Dep't of Health and Human Servs., 998 F.2d 979, 982 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1993); Leggitte v. United States, 104 Fed. Cl. at 316. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Advanced Fiber Techs. (AFT) Trust v. J & L Fiber Servs., Inc., 674 F.3d at 1372; Marriott Int'l Resorts, L.P. v. United States, 586 F.3d at 968; Am. Seating Co. v. USSC Grp., Inc., 514 F.3d 1262, 1266 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2008); Rothe Dev. Corp. v. U.S. Dep't of Def., 262 F.3d 1306, 1316 (Fed. Cir. 2001); Hall v. Aqua Queen Mfg., Inc., 93 F.3d 1548, 1553 n.3 (Fed. Cir. 1996). In such cases, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

In appropriate cases, summary judgment:

saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is

useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

Dehne v. United States, 23 Cl. Ct. 606, 614-15 (1991) (quoting Pure Gold, Inc. v. Syntex, (U.S.A.) Inc., 739 F.2d 624, 626 (Fed. Cir. 1984)), vacated on other grounds, 970 F.2d 890 (Fed. Cir. 1992) (citation omitted); see also Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d 795, 806 (Fed. Cir. 1999) ("The purpose of summary judgment is not to deprive a litigant of a trial, but to avoid an unnecessary trial when only one outcome can ensue."); Metric Constr. Co., Inc. v. United States, 73 Fed. Cl. 611, 612 (2006).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; see also Long Island Sav. Bank, FSB v. United States, 503 F.3d 1234, 1244 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 555 U.S. 812 (2008); Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 971 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2001), cert. denied, 534 U.S. 1109 (2002); Gen. Elec. Co. v. Nintendo Co., 179 F.3d 1350, 1353 (Fed. Cir. 1999); TigerSwan, Inc. v. United States, 118 Fed. Cl. at 451; Stephan v. United States, 117 Fed. Cl. 68, 70 (2014); Gonzales-McCaulley Inv. Group, Inc. v. United States, 101 Fed. Cl. 623, 629 (2011). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. See Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587-88; Yant v. United States, 588 F.3d 1369, 1371 (Fed. Cir. 2009), cert. denied, 131 S. Ct. 69 (2010); Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co., 272 F.3d 1365, 1369 (Fed. Cir. 2001), reh'g and reh'g en banc denied, 293 F.3d 1364 (Fed. Cir. 2002), cert. denied, 539 U.S. 957 (2003); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d at 1257; Wanlass v. Fedders Corp., 145 F.3d 1461, 1463 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1998); see also Am. Pelagic Co. v. United States, 379 F.3d at 1371 (citing Helifix Ltd. v. Blok-Lok, Ltd., 208 F.3d 1339, 1345-46 (Fed. Cir. 2000)); Dana R. Hodges Trust v. United States, 111 Fed. Cl. at 455; Boensel v. United States, 99 Fed. Cl. at 611 ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'") (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 255) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587-88; Casitas Mun. Water Dist. v. United States, 543 F.3d at 1283; Lathan Co. Inc. v. United States, 20 Cl. Ct. 122, 125 (1990))); see also Am. Seating Co. v. USSC Grp., Inc., 514 F.3d at 1266-67; Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d at 807. "However, once a moving party satisfies its initial burden, mere allegations of a genuine issue of material fact without supporting evidence will not prevent entry of summary judgment." Republic Sav. Bank, F.S.B. v. United States, 584 F.3d 1369, 1374 (Fed. Cir. 2009); see also Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48.

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving

party can demonstrate that there is an absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); see also Riley & Ephriam Constr. Co. v. United States, 408 F.3d 1369, 1371 (Fed. Cir. 2005); Crown Operations Int'l Ltd. v. Solutia Inc., 289 F.3d 1367, 1377 (Fed. Cir.), reh'g denied (Fed. Cir. 2002); Trilogy Commc'ns, Inc. v. Times Fiber Commc'ns, Inc., 109 F.3d 739, 741 (Fed. Cir.) (quoting Conroy v. Reebok Int'l, Ltd., 14 F.3d 1570, 1575 (Fed. Cir. 1994), reh'g denied and en banc suggestion declined (Fed. Cir. 1995)), reh'g denied and en banc suggestion declined (Fed. Cir. 1997); Lockwood v. Am. Airlines, Inc., 107 F.3d 1565, 1569 (Fed. Cir. 1997); Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d at 807; RQ Squared, LLC v. United States, 119 Fed. Cl. 751, 757-58 (2015). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. See Celotex Corp. v. Catrett, 477 U.S. at 322; see also Wavetronix LLC v. EIS Elec. Integrated Sys., 573 F.3d 1343, 1354 (Fed. Cir. 2009); Long Island Sav. Bank, FSB v. United States, 503 F.3d at 1244; Florida Power & Light Co. v. United States, 375 F.3d 1119, 1124 (Fed. Cir. 2004); Schoell v. Regal Marine Indus., Inc., 247 F.3d 1202, 1207 (Fed. Cir. 2001); Am. Airlines, Inc. v. United States, 204 F.3d 1103, 1108 (Fed. Cir. 2000); Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d at 807; Rasmuson v. United States, 109 Fed. Cl. 267, 271 (2013). However, "a non-movant is required to provide opposing evidence under Rule 56(e) only if the moving party has provided evidence sufficient, if unopposed, to prevail as a matter of law." Saab Cars USA, Inc. v. United States, 434 F.3d 1359, 1369 (Fed. Cir. 2006).

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case, and it does not follow that summary judgment should be granted to one side or the other. See Prineville Sawmill Co. v. United States, 859 F.2d 905, 911 (Fed. Cir. 1988) (citing Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1391 (Fed. Cir. 1987)); see also Marriott Int'l Resorts, L.P. v. United States, 586 F.3d at 968–69; B.F. Goodrich Co. v. U.S. Filter Corp., 245 F.3d 587, 593 (6th Cir. 2001); Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000); Chevron USA, Inc. v. Cayetano, 224 F.3d 1030, 1037 n.5 (9th Cir. 2000), cert. denied, 532 U.S. 942 (2001); Bubble Room, Inc. v. United States, 159 F.3d 553, 561 (Fed. Cir. 1998) ("The fact that both the parties have moved for summary judgment does not mean that the court must grant summary judgment to one party or the other."), reh'g denied and en banc suggestion declined (Fed. Cir. 1999); Allstate Ins. Co. v. Occidental Int'l, Inc., 140 F.3d 1, 2 (1st Cir. 1998); Massey v. Del Labs., Inc., 118 F.3d 1568, 1573 (Fed. Cir. 1997); LewRon Television, Inc. v. D.H. Overmyer Leasing Co., 401 F.2d 689, 692 (4th Cir. 1968), cert. denied, 393 U.S. 1083 (1969); Rogers v. United States, 90 Fed. Cl. 418, 427 (2009), subsequent determination, 93 Fed. Cl. 607 (2010); Consol. Coal Co. v. United States, 86 Fed. Cl. 384, 387 (2009), aff'd, 615 F.3d 1378, (Fed. Cir.), and reh'g and reh'g en banc denied (Fed. Cir. 2010), cert. denied, 131 S. Ct. 2990 (2011); St. Christopher Assocs., L.P. v. United States, 75 Fed. Cl. 1, 8 (2006), aff'd, 511 F.3d 1376 (Fed. Cir. 2008); Reading & Bates Corp. v. United States, 40 Fed. Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under

consideration, or, otherwise stated, in favor of the non-moving party. See First Commerce Corp. v. United States, 335 F.3d 1373, 1379 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003); see also DeMarini Sports, Inc. v. Worth, Inc., 239 F.3d 1314, 1322 (Fed. Cir. 2001); Gart v. Logitech, Inc., 254 F.3d 1334, 1338–39 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2001); cert. denied, 534 U.S. 1114 (2002); Oswalt v. United States, 85 Fed. Cl. 153, 158 (2008); Telenor Satellite Servs., Inc. v. United States, 71 Fed. Cl. 114, 119 (2006).

Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other necessarily is justified. See B.F. Goodrich Co. v. United States Filter Corp., 245 F.3d at 593; Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d at 1148; Allstate Ins. Co. v. Occidental Int'l, Inc., 140 F.3d at 2; Rogers v. United States, 90 Fed. Cl. at 427; Reading & Bates Corp. v. United States, 40 Fed. Cl. at 748.

"Questions of law are particularly appropriate for summary judgment." Oenga v. United States, 91 Fed. Cl. 629, 634 (2010) (citing Dana Corp. v. United States, 174 F.3d 1344, 1347 (Fed. Cir. 1999) ("Summary judgment was appropriate here [in Dana Corp.] because no material facts were disputed, many being stipulated, and the only disputed issues were issues of law. Moreover, on each issue one party or the other is entitled to judgment as a matter of law.")); see also Santa Fe Pac. R.R. v. United States, 294 F.3d 1336, 1340 (Fed. Cir. 2002) ("Issues of statutory interpretation and other matters of law may be decided on motion for summary judgment.").

LQA is a payment awarded to eligible civilian employees of the United States government serving overseas for the annual cost of suitable housing for the employees and their families. See Roberts v. United States, 745 F.3d at 1160. The granting of LQA is dictated by the Overseas Differentials and Allowances Act, 5 U.S.C. § 5921 et seq. (2012), and its implementing regulations. Under 5 U.S.C § 5923(a), LQA may be granted "[w]hen Government owned or rented quarters are not provided without charge for an employee in a foreign area." The President is empowered to prescribe regulations governing such allowances, see id. at § 5922(c), an authority which the President has delegated to the Secretary of State. See Exec. Order No. 10903, 26 Fed Reg. 217-03, 217-18 (Jan. 9, 1961).

The Secretary of State has used this authority to set "baseline requirements for LQA eligibility" in the DSSR. See Roberts v. United States, 745 F.3d at 1164. The relevant portion of the DSSR makes a distinction between "Employees Recruited in the United States" (DSSR § 031.11) and "Employees Recruited Outside the United States" (DSSR § 031.12). DSSR § 031.11 states that LQA "may be granted to employees who were recruited by the employing government agency in the United States." By contrast, DSSR § 031.12 states, in relevant part, that:

[LQA] may be granted to employees recruited outside the United States, provided that:

a. the employee's actual place of residence in the place to which the quarters allowance applies at the time of receipt thereof shall be fairly attributable to his/her employment by the United States Government; and

b. prior to appointment, the employee was recruited in the United States, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, the former Canal Zone, or a possession of the United States, by:

(1) the United States Government, including its Armed Forces;

(2) a United States firm, organization, or interest;

(3) an international organization in which the United States Government participates; or

(4) a foreign government

and had been in substantially continuous employment by such employer under conditions which provided for his/her return transportation to the United States, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, the former Canal Zone, or a possession of the United States . . . .

DSSR § 031.12.

The DSSR delegates to agency heads such as the Secretary of Defense the power to issue implementing regulations regarding the granting of LQA, "[w]ithin the scope of [the DSSR]," see DSSR § 013, an authority which the Secretary of Defense has delegated to the heads of the Department of Defense's components. See Department of Defense Instruction 1400.25, subchapter 1250.4.1 (Dec. 1996). It was pursuant to this authority that the Army Corps' 2001 LQA Policy and AER 690-500.592, the two documents that have relevance to Mr. Thomas' LQA entitlement claim at various times during his employment with the Army Corps, were promulgated.

The Army Corps' 2001 LQA Policy, a memorandum titled "Living Quarters Allowance (LQA) Policy," was addressed to "All Europe District Employees," dated July 20, 2001, and signed by Col. Michael R. Pelkey, Commander of the Army Corps, Europe District. The 2001 LQA Policy governed the awarding of LQA to all employees in the Army Corps, Europe District, including Mr. Thomas, from the time he was hired at least through March 2008. The operative portion of the 2001 LQA Policy states:

If adequate and suitable Government quarters are not available, LQA will be authorized for the following employees:

a. Recruited from the United States, U.S. territories, possessions, or protectorates with a period of one year or more continuous residence not OCONUS [outside the continental United States].

b. Transferred from another overseas activity, agency, or command that originally recruited the employee from the United States, eligible to receive or receiving LQA, and has not exceeded five years

> overseas in the EUCOM [United States European Command] Area of Responsibility (AOR) at the time of selection.
>
> c. Transferred from another overseas activity, agency, or command in the EUCOM AOR, eligible to receive or receiving LQA, and has not exceeded five years overseas at the time of selection.
>
> d. For locally hired individuals selected for positions for which recruitment from the U.S. is normally made if approved by the Commander prior to selection and the selectee meets the criteria of Section 031.12a and b or Section 031.12c of [the DSSR].

2001 LQA Policy ¶ 8.

The second document at issue in Mr. Thomas' case is AER 690-500.592, issued November 18, 2005. This regulation became applicable to employees of the Army Corp, Europe District, supplanting the 2001 LQA Policy, in April 2008, when the CHRA-E assumed responsibility for servicing them. The operative portion of the regulation, titled "LQA Authorization," states:

> LQA will be granted for the following APF [appropriated fund] employees:
>
> (1) Employees recruited in the United States or its possessions for positions at grades GS-09 (or equivalent), WG-11, WL-09, WS-05, and above. . . . Employees who previously vacated an outside the continental United States (OCONUS) civilian or contractor position must have resided permanently in the United States for at least 1 year immediately before accepting the formal job offer. This 1-year residency requirement does not apply to— . . . .
> (b) Applicants hired into hard-to-fill positions. . . .
> (2) Employees who are recruited from outside the United States or its possessions for positions in grades GS-09 (or equivalent) WG-11, WL-09, WS-05, and above. . . . Former military members and civilian employees will be considered to meet the DSSR, section 031.12, eligibility requirement of "substantially continuous employment" if they are appointed within 1 year after the date of separation or when the transportation entitlement is lost, whichever occurs first. . . .
> (3) Federal civilian or NAF [nonappropriated fund] employees selected for or converted from NAF to positions in grades GS-09 (or equivalent) WG-11, WL-09, WS-05, and above . . . who meet all of the following:
> (a) Are transferring to the European theater from another overseas Government activity or agency without a break in service.
> (b) Meet basic eligibility criteria of DSSR, section 031.11 or 031.12a and b.
> (c) Were already receiving or eligible to receive LQA at the time of selection.

AER 690-500.592 ¶ 7a. Also relevant to Mr. Thomas' claim is paragraph 9 of AER 690-500.592, titled "Continuing Eligibility," which states: "Unless otherwise prescribed, all employees who met the eligibility criteria in prevailing regulations at the time of appointment but who do not meet the criteria of this regulation will continue to receive LQA." Paragraph 9 further states that this provision "[w]ill not extend or reinstate payment of LQA when law, regulation, or policy directed termination of payment." AER 690-500.592 ¶ 9b.

DSSR §§ 031.11 and 031.12 provide the "baseline requirements for LQA eligibility," Roberts v. United States, 745 F.3d at 1164, establishing when LQA "may be granted" to employees, DSSR § 031, and any grant of LQA must be made "subject to [their] provisions." DSSR § 013. Cf. AER 690-500.592 ¶ 4 (Nov. 18, 2005) ("To be considered eligible for allowances covered by this regulation, employees must meet the basic eligibility requirements of DSSR, section 031.11 and section 031.12a and b."). Therefore, to have been eligible to receive LQA, Mr. Thomas first must have met the criteria contained in either DSSR § 031.11 or § 031.12.

DSSR § 031.11 authorizes LQA for employees "recruited by the employing government agency in the United States." Before this court, Mr. Thomas argues that the structure of this sentence means that "[w]hat is significant is not the location of the employee, but the location of the employing government agency" (emphasis in original). This argument ignores the basic structure of the DSSR § 031, which creates two separate classes of employees: "Employees Recruited in the United States" (DSSR § 031.11) and "Employees Recruited Outside the United States" (DSSR § 031.12). This distinction furthers the purpose of LQA under the Overseas Allowances and Differentials Act, which was "designed to give something extra to employees who must go overseas." Acker v. United States, 223 Ct. Cl. 281, 290 (1980); see also Bortone v. United States, 110 Fed. Cl. 668, 677 (2013) ("[I]t appears from the statute that the purpose of LQA is to provide an incentive to prospective employees to move overseas to work for the federal government."). DSSR § 031.11 applies only to those employees who were physically located in the United States at the time of their hire. Because Mr. Thomas was living and working in Italy at the time of his recruitment, this provision does not apply to him, regardless of where his employing agency was located. See Bortone v. United States, 110 Fed Cl. at 677 (holding that the Navy properly construed DSSR § 031.11 "to exclude individuals who live abroad, are encouraged to apply for a job and then apply for a job in the foreign location but travel to the United States for the purposes of being formally hired and sworn in").

Therefore, to qualify for LQA, Mr. Thomas must have met the requirements of DSSR §§ 031.12a and b. Mr. Thomas met the requirement of DSSR § 031.12a that his place of residence in the place to which the LQA applies be "fairly attributable to his/her employment by the United States Government," as it is undisputed that it was understood Mr. Thomas would return to Texas when his contract with Wireless ended. Mr. Thomas also met the requirements of DSSR § 031.12b(2) that prior to his appointment he be recruited in the United States by a United States firm and that his employment with this firm have been "substantially continuous," as it is also undisputed that he was recruited

in Texas by Wireless, a United States firm, where he worked continuously from October 2003 until May 2004.

Contested is whether Mr. Thomas also met the requirement of DSSR § 031.12b that his previous employment have been "under conditions which provided for his/her return transportation to the United States." The government argues that, because Mr. Thomas' offer letter from Wireless entitled him to return transportation only "[u]pon completion of 12 months of employment," and Mr. Thomas, in fact, had completed only eight months of employment with Wireless before joining the Army Corps, his return transportation entitlement never vested, and, therefore, his previous employment did not provide for his return transportation to the United States, as required by DSSR § 031.12b. In support of this argument, the government cites to Urban v. United States, 119 Fed. Cl. 57 (2014). In Urban, the plaintiff's prior employer had a policy entitling employees to return transportation to the United States if they worked there for at least twelve months. See id. at 59-60. The Urban plaintiff worked at his employer for only three months before resigning to take an overseas civilian position with the Army, for which he was denied LQA on the grounds that his previous work agreement failed to provide return transportation to the United States. See id. at 60. In upholding this denial, the court in Urban noted that the plaintiff's entitlement under the return policy had never vested because he failed to satisfy its twelve month requirement. See id. at 62. Thus, the court found, the plaintiff had failed to satisfy DSSR § 031.12b's requirement "that the conditions already be in place to insure return transportation to the United States." Id. at 63.

Mr. Thomas argues that Urban is distinguishable because, unlike his offer letter, "the agreement in question in the Urban case did not ensure return transportation." The relevant terms of Mr. Thomas' Wireless offer letter, however, which provided for return transportation to the United States "[u]pon completion of 12 months of employment" are very similar to those in the employer policy at issue in Urban, which provided for return transportation "as long as [the employee had] been on board for at least twelve months." Id. at 59. As in Urban, Mr. Thomas resigned from his employer before the twelve months his contract required for return transport. Therefore, as in Urban, Mr. Thomas' entitlement to return transportation had failed to vest at the time he was hired by the Army Corps, for which reason the conditions were not in place to ensure his return transportation to the United States. Thus, Mr. Thomas failed to satisfy the requirements of DSSR § 031.12b.

Mr. Thomas also argues that because the Army Corps never made a determination of his eligibility, or lack thereof, for LQA under the DSSR before denying him LQA, the government cannot now rely on his ineligibility under the DSSR to justify its decision after the fact. Regardless of how it justified its decision, the Army Corps had no power to grant LQA in situations not authorized by the DSSR, and to have done so would have been without a basis in the law.[4] See Office of Pers. Mgmt. v. Richmond, 496 U.S. 414, 416

---

[4] DSSR § 031.12 provides that DSSR § 031.12b "may be waived by the head of agency upon determination that unusual circumstances in an individual case justify such action." The version of the regulation delegating authority to Department of Defense component heads to implement regulations regarding LQA that is included in the Administrative Record, Department of Defense Instruction 1400.25, subchapter 1250.5.1.3 (December

(1990) ("[P]ayments of money from the Federal Treasury are limited to those authorized by statute . . . ."); Poillucci v. Dep't of Justice, 459 F.3d 1351, 1355-56 (Fed. Cir. 2006) (holding there was no legal basis for granting plaintiff retirement benefits to which he is not entitled by statute, "even though a government agency expressed the view that he was eligible for those benefits") (citing Office of Pers. Mgmt. v. Richmond, 496 U.S. at 416). Because he did not meet the baseline requirements laid out in the DSSR at the time of his hire, Mr. Thomas was not, and is not, eligible to receive LQA.

Even assuming that he did meet the requirements of the DSSR at the time of his hire, Mr. Thomas would not be now, nor have been, at any point during his employment with the Army Corps, entitled to receive LQA. To have an entitlement to LQA, an employee must meet not only the requirements of the DSSR, but also any implementing regulations promulgated pursuant to it. See Roberts v. United States, 745 F.3d at 1167 ("[Plaintiff's] recovery turns on whether he is a member of a class entitled to LQA under the Order and the Job Announcement.") (emphasis in original). Based on the information provided by the parties, Mr. Thomas failed, however, at any point during his employment with the Army Corps, to meet the requirements of either of the two implementing regulations applicable to him, the 2001 LQA Policy or AER 690-500.592.

Mr. Thomas failed to meet any of the criteria in the 2001 LQA Policy, which was applicable to him from the time he was hired until April 2008. He was not recruited in the United States, but had been living and working in Italy for five months at the time he was hired by the Army Corps. See 2001 LQA Policy ¶ 8a. He was not transferred to the Army Corps from another overseas activity, agency, or command, but was hired after working for a civilian contractor. See id. ¶¶ 8b, c. His Commander did not approve LQA for his position prior to his selection. See id. ¶ 8d. Rather than contest these facts, Mr. Thomas argues that the Army Corps erred in denying him LQA at the time of his hire because it failed to follow its own procedures in doing so. In particular, Mr. Thomas argues that the 2001 LQA Policy provision authorizing LQA for local hires, "if approved by the Commander prior to selection," paragraph 8d, actually "required" the Commander to personally review and consider LQA for Mr. Thomas' position prior to his selection. Mr. Thomas argues that the evidence shows that the decision not to approve LQA for his position was not made by the Commander, but "was apparently made by a Human Resources clerk based on some undisclosed criteria," and that this clerk "effectively usurped the Commander's authorizing authority." Mr. Thomas further argues that the evidence shows that the clerk's decision was "based on two erroneous assumptions: 1) that local hires were not eligible for LQA; and 2) that if LQA had been authorized that authorization would have been contained in the vacancy announcement." Because of these alleged failures, Mr. Thomas argues the Army Corps' decision that he was not

_____

1996), states that such a waiver will be approved only if the employee "entered the country in which the foreign post is located as the spouse of a sponsor who was eligible for the quarters allowance" or "[t]he employee is an incumbent of a position designated as emergency-essential according to DoD Directive 1404.10." Plaintiff has not alleged any facts that would allow him to meet these requirements.

eligible for LQA at the time of his hire was "arbitrary, capricious and not based on law, and therefore should be overturned."

In arguing that the Army Corps' actions were arbitrary, capricious, and not based on law, Mr. Thomas must overcome a high hurdle. "[M]ilitary administrators are presumed to act lawfully and in good faith like other public officers, and the military is entitled to substantial deference in the governance of its affairs." Dodson v. U.S. Gov't, Dep't of Army, 988 F.2d 1199, 1204 (Fed. Cir. 1993). The plaintiff bears the burden of overcoming the "'strong, but rebuttable, presumption' that the military discharges its duties 'correctly, lawfully, and in good faith.'" Bernard v. United States, 59 Fed. Cl. 497, 501 (quoting Hary v. United States, 223 Ct. Cl. 10, 17, 618 F.2d 704, 707 (1980) (citations omitted)), aff'd, 98 F. App'x 860 (Fed. Cir.), reh'g denied (Fed. Cir. 2004); see also Spellissy v. United States, 103 Fed. Cl. 274, 283 (2012); Boyle v. United States, 101 Fed. Cl. 592, 596 (2011) (citing Richey v. United States, 322 F.3d 1317, 1326 (Fed. Cir. 2003)).

Mr. Thomas has not proven that the Army Corps actually committed the errors he alleges. First, there is evidence that a senior official in Mr. Thomas' command did consider whether to provide LQA for his position prior to his hiring, but declined to do so. In explaining why Mr. Thomas had initially been denied LQA, Col. Burcham stated that "it was never the intent to offer LQA for the position to which you were hired." Similarly, Lt. Col. Lungu explained that Mr. Thomas was denied LQA, in part, because "[LQA] was not being offered to other applicants who may have applied through the competitive process for the same position." While these statements were made after the fact, they are consistent with the record created contemporaneously to Mr. Thomas' hiring, which demonstrates that there was no intent by the Army Corps to offer Mr. Thomas LQA. The vacancy announcement for Mr. Thomas' position made no mention of the availability of LQA if hired. Notes on Mr. Thomas' Standard Forms 50 and 52 stated "Local hire - not entitled to LQA." A note on his Checklist for Recruit Actions indicated that a "Completed LQA Eligibility Form" was not applicable. Moreover, an Army Corps administrative assistant told Mr. Thomas six days after he was offered the position that "No LQA nor PCS [was] authorized."

More fundamentally, Mr. Thomas' argument fails because the 2001 LQA Policy did not impose a requirement on the Commander to personally consider the applicability of LQA to his particular position or to personally consider LQA for every hire. In fact, the language of the 2001 LQA Policy stating that LQA would be granted "if approved by the Commander prior to selection" required the Commander to review and make such a decision only if LQA was to be granted to a local hire. See 2001 LQA Policy ¶ 8d. Additionally, there is strong evidence that such LQA grants to local hires were meant to be exceptional, with the 2001 LQA Policy stating "Living Quarters Allowance (LQA) is not an automatic salary supplement or an entitlement. . . . When an individual is already residing in a foreign area, LQA as a recruitment incentive is not normally required." Thus, the most logical reading of the 2001 LQA policy is that, absent an express determination by the Commander that LQA should be provided for a position, a determination that in most cases would not be made, no LQA would be provided to local hires. See Roberts v. United States, 745 F.3d at 1167 (finding plaintiff was not entitled to LQA because his "position was not designated as LQA-eligible" in its job announcement).

Nor can Mr. Thomas find relief based on AER 690-500.592, which has governed his LQA status since April 2008. While AER 690-500.592's Continuing Eligibility provision might have entitled Mr. Thomas to continue receiving LQA had he already been receiving it under the 2001 LQA Policy, no other provision of the AER 690-500.592 provided Mr. Thomas with an LQA entitlement, as apparently was conceded by Mr. Thomas' new attorney at the June 16, 2015 oral argument. AER 690-500.592 authorizes LQA for three types of employees: (1) employees recruited in the United States at grade GS-09 and above; (2) employees recruited outside the United States at grade GS-09 and above; and (3) employees transferring to the European theater from another overseas Government activity or agency who were already receiving or eligible to receive LQA. AER 690-500.592 ¶ 7a. Mr. Thomas had already been recruited at the time CHRA-E began servicing the Army Corps and, thus, (1) and (2) are not applicable. See id. ¶ 5a(1) ("The CHRA-E will . . . Determine the employee's eligibility for LQA before the employee is appointed.") (emphasis added). Nor was Mr. Thomas transferred from another overseas government activity or agency. Since he was hired in April 2004, Mr. Thomas has worked in the same construction representative position for the Army Corps. Although the 2001 LQA Policy was supplanted by AER 690-500.592, he remained in the same job and no transfer was made. Therefore, even if he had met the DSSR eligibility requirements, Mr. Thomas would not, at any point during his employment with the Army Corps, have had an entitlement to receive LQA under either the 2001 LQA policy or AER 690-500.592.

The two requests made by the Commander of Mr. Thomas' Army Corps District, Col. Kem, to Army CPD in 2009, that Mr. Thomas be granted LQA and that any provisions of AER 690-500.592 that Mr. Thomas did not meet be waived, do not change this conclusion. There are two waiver provisions in AER 690-500.592: paragraph 8c and paragraph 8d. Paragraph 8c discusses "waivers of unauthorized allowances based on eligibility factors that are not locally governed" and states that "[t]he CPD will review claims and forward them with appropriate recommendations to the decision-making authority." Although it is unclear whether this provision applied to Col. Kem's waiver request, even if it did, the CPD would have fulfilled its obligations through the response, dated March 2, 2010, of Aleck Hernandez to Col. Kem's request. Paragraph 8d governs waivers exercised under the provisions of Department of Defense Instruction 1400.25, subchapter 1250, "paragraph 5.1.1.2.2," a provision which is not contained in the version of Department of Defense Instruction 1400.25, subchapter 1250 (December 1996), that was provided in the Administrative Record. Regardless, paragraph 8d simply repeats the requirements that the Administrative Record's version of Department of Defense Instruction 1400.25, subchapter 1250.5.1.3, lists for waivers of the requirements of DSSR § 031.12b, and, states that, in addition, "employees must meet the requirements of this regulation (AE Reg 690-500.592)." Thus, Mr. Thomas' failure to meet the requirements of AER 690-500.592 made him ineligible for such a waiver.

## CONCLUSION

For the foregoing reasons, the defendant's Motion for Summary Judgment is **GRANTED**. Plaintiff's Motion for Summary Judgment is **DISMISSED**. Plaintiff's amended complaint is **DISMISSED**. The Clerk of Court shall enter **JUDGMENT** for the defendant consistent with this opinion.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**